UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

Umar Alli,

                                 Plaintiff,

 -against-

City of New York, Officer Matthew Pedlar, Shield
No. 4988, Officer Antonio Bravo, Shield No.
17297, Officer Geronimo Almanzar, Shield No.
40633, Captain Carter, Shield No. 1086, Officer
Paul Bunton, Shield No. 14371, Captain Budnarine
Behari, Shield No. 1603, Officer Spears, Officer
Rhor, Officer Fluker, Officer Wong, Captain Gates,
Captain Medina, Officer Kouroklis, Officer
Sanchez, Officer Nicholas Spiris, Shield No. 18445,
Officer Lopez, Officer Diaz, Officer Stokes,
Captain Steward-Bowden, Officer Villete, Officer
Harris, Officer Estrella, Officer Williams,
John/Jane Doe Corrections Officers 1-20,
John/Jane Doe Corrections Department Physicians
1-3, Dora Schriro, Rose Argo, Kathleen Mulvey,
Hildy J. Simmons, Florence Finkle, Lewis
Finkelman, Michael J. Regan, Richard T. Wolf,
Kenneth T. Armstead, Investigator I. Martinez,
Investigator Garcia, Investigator Arnold,
Investigator Daggett-Terenzi, Pravin Rajan, M.D.,
Devorah J. Nasarian, M.D., ADW Edmund Duffy,
ADW Kenneth Stukes, ADW Brian Sullivan, ADW
Collins,

                               Defendants.

------------------------------------------------------------------ x

**PROPOSED SECOND
AMENDED
COMPLAINT**

Jury Trial Demanded

No. 14 Civ. 10257 (RA)
(JLC)

<u>PRELIMINARY STATEMENT</u>

In this case, Plaintiff Umar Alli alleges that the New York City Department of Corrections ("NYC DOC") and its employees violated his rights on various occasions while he was in their custody.

## NATURE OF THE ACTION

1.      This is an action to recover money damages for those rights violations arising from the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

3.      This Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## JURY DEMAND

5.      Plaintiff demands a trial by jury in this action pursuant to Federal Rule of Civil Procedure ("FRCP") 38.

## PARTIES

6.      At all times relevant to this action, Plaintiff Umar Alli was in the care and custody of the New York City Department of Corrections ("NYC DOC") at Rikers Island.

7.     Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.     Defendant City of New York maintains the NYC DOC, a duly authorized public authority and/or corrections department, authorized to perform all functions of a corrections department as per the applicable sections of the aforementioned municipal corporation, the City of New York.

9.     Defendant Officers Pedlar, Behari, Bravo, Almazar, Spears, Bunton, Rhor, Fluker, Wong, Medina, Gates, Kouroklis, Sanchez, Spiris, Lopez, Diaz, Stokes, Steward-Bowden, Villette, Harris, Estrella, Carter, Williams, Defendant John/Jane Doe Corrections Officers 1-20, Defendant John/Jane Doe Corrections Department Physicians 1-3, all individually, were at all times relevant duly sworn corrections officers, employees and agents of the NYC DOC and were acting under the supervision of said department and according to their duties.

10.     Defendant Investigators Daggett-Terezni, Arnold, Garcia and I. Martinez, all individually, were at all times relevant duly sworn employees of New York City Corrections and/or an independent City IG agency, and were acting under the supervision of said department and according to their duties.

11.     Defendants Dora Schriro, Rose Argo, Kathleen Mulvey, Lewis Finkelman, Florence Finkle, Michael J. Regan, Hildy J. Simmons, Kenneth T.

Armstead, Cathy Potler and Richard T. Wolf, all individually, were at all times relevant duly sworn employees of New York City Corrections and were acting under the supervision of said department and according to their duties.

12.     Defendant Edmund Duffy, then a warden on Rikers Island; Defendant Kenneth Stukes, then an assistant deputy warden on Rikers Island; Defendant Brian Sullivan, then an assistant deputy warden on Rikers Island; and Defendant Collins, then an assistant deputy warden on Rikers Island ("Warden Defendants").

13.     Defendants Pravin Rajan, M.D., and Devorah J. Nazarian, M.D., were DOC employees sued in their individual capacities, who were charged with providing inmates with care responsive to their medical needs, and who were acting according to their duties and under departmental supervision.

14.     At all times hereinafter mentioned Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State of New York and/or the City of New York.

15.     Each and all of the acts of the Individual Defendants were done by said Defendants while acting within the scope of their employment by Defendant City of New York.

## STATEMENT OF FACTS

16.     On or about January 10, 2012, Plaintiff was in Defendants' custody on Rikers Island in the George R. Vierno Center ("GRVC").

17.     At the time of the first incident challenged in this action, Plaintiff was a pre-trial detainee with enhanced-restraint status living in punitive segregation. Plaintiff's enhanced-restraint status was the result of a previous proceeding against him.

18.     As a result of Plaintiff's enhanced-restraint status, NYC DOC staff were required by City rules and regulations to follow particular procedures when removing Plaintiff from his cell; transporting him from one location to another within GRVC for meals, shower, recreation, visits, etc.; and transporting him to court.   These procedures were similar to procedures for inmates with Centrally Monitored Case ("CMC") designations.

19.     On or about January 10, 2012, Assistant Corporation Counsel Lesley Mybaye was scheduled to take Plaintiff's deposition in another litigation he had filed challenging a rights violation.

20.     Normally Defendants would have transported Plaintiff to an area at GRVC dedicated for depositions and other legal proceedings.   However, on the date of the incident, this area was allegedly closed and Plaintiff's deposition therefore was going to be taken in GRVC's visiting area.

21.     GRVC's visiting area had three general areas.  First, there was an inmate search room.  As the name suggests, inmates would be searched here before going into a visit.  Next, there was an inmate waiting area, where a post-search inmate would await his turn to receive a visitor.  Finally, there was the visiting space itself.

22.     As for the visiting space, it had four sub-parts.  Each one was designed with special feature to accommodate a different category of inmate: (1) general population inmates; (2) punitive segregation inmates; (3) inmates being monitored for mental-health issues; and (4) enhanced-restraint/CMC inmates.  For example, the CMC inmates' visits were hosted in non-contact booths.

23.     In the middle of GRVC's visiting area was a space called the "bubble." NYC DOC corrections officers were posted in the bubble at all times in order to monitor the search, waiting and visiting rooms.

24.     There were video cameras mounted and recording at the visiting area at all relevant times, and at the entrances/exits as well.

25.     On January 10, 2012, Plaintiff's deposition was scheduled to begin at 10:00 a.m. and Defendants took Plaintiff to GRVC's visiting area and put him in a booth.  Plaintiff waited there for three hours by himself before, at approximately 1:00 p.m., Ms. Mbaye arrived and the deposition began shortly thereafter.  During this time Defendant Corrections Officers became aware that Mr. Alli was going to be deposed in connection with a civil rights litigation to which he was a party.

26.     At approximately 2:45 p.m., Ms. Mbaye stopped the deposition and left, planning to continue the proceeding on another day.   This was because the Correctional Officers at GRVC were going to do a shift change at 3:00pm.   Other visitors left as well.

27.     Corrections officers escorted all inmates out of the visiting area in preparation of shift chance.   However, Individual Defendants who had escorted Plaintiff did not retrieve him from the visiting booth where he had sat for the deposition in the civil rights case.   Before long Plaintiff found himself alone in the visiting area.

28.     Plaintiff called out to John/Jane Doe Corrections Officers in the bubble and pleaded for someone to come and get him.   John/Jane Doe Corrections Officers in the bubble responded by turning off the light.

29.     Plaintiff became afraid as to what was happening.   He then heard the sound of footsteps in the dark room and, as best he can recollect, the noise of a walkie talkie.

30.     Defendants ordered Plaintiff to put his hands through the visiting booth's cuffing port and he did.   Defendants handcuffed Plaintiff, then placed him in a waist restraint and shackles as well.

31.     Defendants guided Plaintiff to the waiting area.   As they entered, Plaintiff saw that the waiting area was darkened as well.

7

32.     Defendant Pedlar initiated the use of force against Plaintiff by punching him in the face with a closed fist.  Plaintiff fell to the floor.

33.     As best Plaintiff could tell, there were between ten and fifteen John/Jane Doe Corrections Officers who took turns using force against him by stomping, kicking and throwing things at him while he was on the floor restrained with handcuffs, waist belt and shackles.  Among other things, Defendants struck Plaintiff's neck, back, abdomen, testicles and more.  At the same time, Defendants swore and spat at Plaintiff, causing him further fear, upset and confusion.  Certain Defendants shouted at Plaintiff during the assault, stating in sum and substance that Plaintiff was an asshole who liked to sue people and that they would kill him.  On information and belief, Defendants Villette, Bravo, Behari, Rhor, Lopez, Spears, Spiris, Kourouklis, Diaz, Stokes, Carter, Harris and Almazar were among the Defendants who were personally involved in the January 10, 2012, assault and/or failed to intervene to stop and/or report it despite being present.  Among other assaultive actions, Defendant Captain Behari placed Plaintiff's waist chain at Plaintiff's throat, causing Plaintiff pain and discomfort and a feeling of strangulation.

34.     John/Jane Doe Officers sitting in the bubble at the time of the incident said nothing and did nothing to stop the assault.  In addition, they later failed to provide information regarding the incident.  On information and belief, one of the John/Jane Doe Officers in the bubble at the time of the incident may have been

Lopez, who then joined in the actual assault. On information and belief, the bubble's log book would aid in identifying Defendant John/Jane Doe Officers.

35.     After the waiting-room assault, Defendants took Plaintiff to a shower pin, presumably to attempt to clean the injuries they had inflicted upon him. In taking Plaintiff to the shower pin, they took him through the video-recorded area. Once in the shower pin, Defendants used further force upon Plaintiff, injuring him more.

36.     As a consequence of the assault, Plaintiff suffered spleen, spine and back injuries. In the aftermath of the use of force against him, Plaintiff had blood in his urine, headaches, testicular pain, neck pain and back pain. He was treated at East Elmhurst Hospital for these and other injuries. Plaintiff's injuries were such that he could not walk well or stand for long periods of time.

37.     Once Plaintiff was discharged from East Elmhurst Hospital and returned to Rikers Island, Plaintiff required medical treatment of his injuries and requested the same of Defendants Rajan and Nazarian, Doe Physicians and Nurses on rounds. For example, he told Defendants Rajan and Nazarian, Doe Physicians and Nurses about blood in his urine and continuing complications arising from symptoms documented while he was at East Elmhurst, but Medical Personnel Defendants denied Plaintiff visits to the infirmary and pain medication on the basis of other Defendants' instruction, as opposed to their own independent professional judgment as their employment duties required. Meanwhile, Plaintiff suffered significant

disability in walking, standing, urinating and other major life activities, all of which constituted a serious medical need that threatened substantial risk of significant injury.

38.     As a consequence of Defendants' deliberate indifference to Plaintiff's serious medical needs, he continues to suffer medical needs and some disability. Rajan, Nazarian, and Doe Physician/Nurse Defendants failed to follow East Elmhurst's recommendations about treating Plaintiff's injuries, including but not limited to, taking MRIs, prescribing medications providing rehabilitative therapy, and scheduling follow up appointments. On information and belief, Rajan, Nazarian, Doe Physician/Nurse Defendants' indifference was deliberate because it was designed to minimize the effects of Defendants' assault as opposed to ameliorate Plaintiff's medical needs, thus minimizing the likelihood that Defendants would be held accountable for the former and maximizing the risk that Plaintiff would suffer serious impairment for the latter.  At the time of Doe Physician/Nurse Defendants' refusal to provide the necessary follow up care to treat Plaintiff's lasting injuries from the assault, Defendant Beharri, who was involved in the assault, conducted regular tours of Mr. Alli's housing area and personally told Plaintiff that he would not allow the requested care.

39.     After the January 10, 2012, assault, Defendant Pedlar fabricated evidence and issued a false infraction report against Plaintiff in order to invent a justification for Defendants' use of force upon Plaintiff when in fact Plaintiff was wholly

restrained during the assault and when in fact Defendants' motivation for using force upon Plaintiff was to punish him for asserting his rights in the context of the civil rights litigation.

40.     On information and belief, Defendant Captain Steward-Bowden began to investigate the infraction.  Her investigation in this capacity was meant to provide Mr. Alli with an independent, impartial examination of the infracting officers' allegations.  Defendant Captain Steward-Bowden failed to provide Plaintiff with this due process and her investigation was conducted with a bias toward finding that Defendants were justified in beating Plaintiff, for example, by denying Plaintiff's request to enter the video footage in evidence (on information and belief, this early refusal to preserve and use the video was because Defendants had seen the video and knew that it incriminated Defendants).  Later, Defendant Captain Steward Bowden provided only pro-Defendant evidence to the Doe Defendant Adjudication Captain who presided over Plaintiff's disciplinary hearing.  Doe Defendant Adjudication Captain perpetuated and aggravated the deprivation of Plaintiff's right to process by continuing to deny Plaintiff's request to preserve and look at the video footage relating to the incident.

41.     Defendants' investigation and adjudication of the infraction failed to provide Plaintiff with due process in other ways.  Defendants denied still other simple discovery requests that Plaintiff made, for example, requests for: (1) the bubble's log

book; (2) roll records showing the names and assignments of the John/Jane Doe Defendants who were working at GRVC on the date of the incident; (3) certain material witnesses; and more.  In addition, Defendant Adjudication Captain overruled and failed to seriously consider Plaintiff's objections to inconsistent and incredible testimony and the presentation of unsupported evidence at his hearing.

42.     Plaintiff's process rights were also violated insofar as Doe Defendants aiding Defendant Steward Bowden misrepresented Plaintiff's statements in a video-recorded interview he provided them about the incident.  When Plaintiff read Defendant Steward Bowden's investigative report about the matter, he saw that it materially misrepresented his sworn statements.  Plaintiff requested the videotape in order to demonstrate that this was true, but Defendants—Defendant Steward Bowden and the Doe Adjudication Captain among them—did not permit Plaintiff a copy of the tape.  This left the investigative report's false "evidence" of Plaintiff's statement uncorrected.

43.     Furthermore, Defendant Investigator Garcia, Arnold, Daggett-Terenzi, I. Martinez, and John/Jane Doe Investigators performed the same perfunctory examination of the assault and false infraction as Defendant Steward Bowden in violation of their job responsibilities to provide independent, impartial and due process to Mr. Alli.  These Investigator Defendants worked either for NYC DOC's own investigative division or, on information and belief, for an independent agency

formed to conduct such investigation.  By way of brief example of how this was true (Mr. Alli also incorporates by reference his complaints about Defendant Steward Bowden here), investigators failed to interview many Defendants involved in the use of force against Plaintiff, an omission that was aggravated further when Doe Adjudication Captain denied Plaintiff's request to call these same people as eye witnesses.  Finally, Doe Investigators failed to press the Defendants they did interview about the identities of still other Defendants.

44.     After the assault, during the investigation, during the disciplinary hearing, and beyond, Plaintiff maintained a letter-writing campaign to various officials asking for their help in intervening to stop Defendants' ongoing violation of his rights, and in taking action to hold Defendants accountable for their past violation of his rights.  Defendants failed to respond, but the result was that Plaintiff became known to NYC DOC personnel as insisting upon redress for the violation of his rights.

45.     Plaintiff's insistence upon challenging the rights violations caused Defendants to retaliate against him in an effort to chill Plaintiffs' willingness to continue to seek redress for the violations.  This took a variety of forms.  For example, some of the same Defendants who played a role in the assault—Beharri, for example—worked tours that gave them responsibility for caring for Plaintiff.  In order to punish and retaliate against Plaintiff, Defendants placed Plaintiff in a cell with

broken plumbing. This housing assignment had the constructive effect of being a deprivation order, i.e., it deprived Plaintiff of the most fundamental aspects of humane treatment. During Plaintiffs' assignment to this cell, he was required to urinate in the sink drain (the toilet would have eventually overflowed) and had to live with the stench of feces which resided in the broken toilet.

46.   On February 23, 2012, Correctional Officers came to Plaintiff's cell to conduct a search in connection with a search that the institution was executing upon all cells in that housing area. Certain of the officers that came to Plaintiff's cell were Defendants who had been involved in the January 10, 2012, assault, and taunted Plaintiff. Plaintiff became afraid and asked to speak to Defendant Captain Medina, who was among the officers supervising the cell searches. Plaintiff told Defendant Captain Medina that he had no problem being cuffed and removed and his cell searched, but respectfully asked him whether other Correctional Officers might extract him rather than the Defendants who had been involved in the January 10, 2012, incident.

47.   Defendant Captain Medina refused Plaintiff's request and ordered a forcible cell extraction unless Plaintiff agreed to allow Defendants to cuff and remove him. Through an intermediary, Defendant Captain Media stated that he would not negotiate with terrorists, an apparent allusion to Plaintiff's religion and name.

48.   Search team officer Jerome Williams came to Plaintiff's cell with a video

camera and asked Plaintiff on camera whether he was refusing the cell search.   As Defendant Officer Williams was recording, Plaintiff responded that he was not refusing but that he had asked that Defendants not be the search officers.   Defendant Officer Williams talked over Plaintiff's voice in order to muddle the clarity of Plaintiff's attempt to explain.

49.   In the end, Defendant Captain Medina sent officers other than Defendants to conduct the search, but by this time, Defendant Captain Medina and the other Defendants had shared their rancor toward Plaintiff with the other search officers.   As a result of Defendants' encouragement, Defendant Officers Fluker, Wong, Estrella, Harris and Bunton entered Plaintiff's cell.   Plaintiff was kneed and, when Plaintiff fell to the ground, Defendants used force to yank Plaintiff's hands and arms to handcuff him, hurting him in the process.   Defendant Officer Bunton inserted his finger inside Plaintiff's rectum and ridiculing him.   Defendant Captain Medina took no action to stop this unjustifiable use of force against Plaintiff.

50.   Defendant Officer Bunton filed a fabricated infraction against Plaintiff which omitted the material information relating to Plaintiff's acquiescence to the search, and that Plaintiff had merely asked that one of many search officers already on the scene be the ones to remove him from the cell, rather than Defendants against whom he had previously alleged assault.

51.   Defendant Investigating Captain Gates conducted another biased

investigation of the already-fabricated infraction and Doe Adjudication Captain Defendant perpetuated Defendant Captain Gates's failure to provide due process. Defendant Captain Gates refused, for example, to review Defendant Officer Jerome's videotape of Mr. Alli stating that he acquiesced to the search.  Doe Adjudication Captain also refused to look.   Defendant Captain Gates and Doe Adjudication Captain also relied almost exclusively on Defendant Officer Bunton's account.  By failing to consider statements made by other material witnesses or take their testimony, Defendants intentionally or with deliberate indifference failed to consider Defendants' contradictory versions of what happened during the February 2013 incident.   Defendants failed to consider Plaintiff's medical records which, among other things, would have corroborated Plaintiff's version of events.

52.    Defendants made guilt determinations against Plaintiff in connection with the fabricated infractions written against Plaintiff in connection with Defendants' January 10, 2012, and February 23, 2012, misconduct.  As a result, Plaintiff received punitive segregation sentences which, when combined, resulted in a lengthy period during which Plaintiff, a pre-trial detainee at the time, had to endure atypical and severe hardship compared to others in his position.  Among other things, Plaintiff experienced material reductions in his: cell space, cell amenities, recreation time, recreation facilities, privacy, time for meals, amount of food, ability to use the shower, access to personal toiletries and cleaning products, social activities, participation in

programming, access to the telephone, access to visits, receipt of mail, access to commissary, access to the library, access to television, and more.  He was placed in a housing area which had structural problems resulting in regular flooding when pipes leaked or fire sprinkler systems would randomly go on.

53.     Plaintiff further experienced atypical and severe restrictions because the food distribution system for the punitive segregation housing area was so poor, Plaintiff was suddenly deprived of meals that allowed him to conform to his religion's requirements.   In addition, for some reason, from the time that Plaintiff entered punitive segregation, he was thereafter required to wear a prison jumpsuit to his court appearances, whereas he had previously been able to change into civilian clothes on such occasions.

54.     As Mr. Alli was experiencing all of the aforementioned problems, he sought help from various individuals in positions of some power and/or authority working in City Corrections, with particular attention paid to individuals whose positions dealt with policing rights violations and integrity problems within the DOC facilities.  For example, he wrote and sent letters to these Defendants telling them of his travails, from the January 10, 2012, assault, to the violations of due process plaguing the fabricated infractions filed against him and related investigations and disciplinary proceedings.  For example, Mr. Alli wrote and sent letters seeking help to Defendant Dora Schriro, the Commissioner of the NYC DOC; Defendant Lewis

Finkelman, then a deputy commissioner at the NYC DOC; Defendant Florence Finkle, then a deputy commissioner in charge of internal investigations at Rikers; Defendant Michael J. Regan, then a member of the NYC BOC; Defendant Hildy J. Simmons, then a member of the NYC BOC; Defendant Kenneth T. Armstead, then Director of Field Operations at the NYC BOC; and Defendant Richard T. Wolf, then deputy executive director of NYC BOC ("DOC and BOC Defendants").

55.      Mr. Alli also wrote and sent letters seeking help to Defendant Rose Argo, then a warden on Rikers Island; Defendant Kathleen Mulvey, then a warden on Rikers Island (over the relevant time period, Mr. Alli resided in two different buildings, thus his pursuit of help from two different wardens); Defendant Edmund Duffy, then a warden on Rikers Island; Defendant Kenneth Stukes, then an assistant deputy warden on Rikers Island; Defendant Brian Sullivan, then an assistant deputy warden on Rikers Island; and Defendant Collins, then an assistant deputy warden on Rikers Island ("Warden Defendants").

56.      Despite Mr. Alli's written pleas to DOC and BOC Defendants and Warden Defendants asking that they intervene to aid in the violations of his rights, DOC and BOC Defendants and Warden Defendants, having received actual notice of the constitutional torts being committed, failed to remedy the wrong.

57.      Importantly, Mr. Alli did not just provide Defendants notice of the constitutional harm he suffered in the context of the excessive force, where

Defendants may not have been able to remedy the wrong after the fact, but in the context of the ongoing violations relating to due process and indifference to his serious medical needs.  In these latter realms Defendants certainly had opportunity to remedy the wrongs as they continued to happen, yet no action was taken by Defendants, despite their having actual notice, nor, on information and belief, did they dispatch someone to investigate in the field as their offices enabled them to do.

**Monell Allegations**

58.     All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to customs, policies and/or practices which the City maintains in furtherance, one supposes, of maintaining order in its correctional facilities.

59.     The manner in which the City adjudicates disciplinary allegations against inmates at Rikers Island does not work.  It is either corrupted by individuals who seek retaliatory or other objectives other than due process, for example, the manufacture by NYC DOC employees of false evidence to commence a proceeding against an individual inmate, then the adjudication captain's unwillingness to seriously test the charges by using fair procedures or by drawing reasonable conclusions from the facts before them.  As exhibited by the allegations made in this complaint, Plaintiff sent multiple reports to Defendants Schriro, Argo, Mulvey, Finkelman, Finkle, Regan,

Armstead, Potler, Wolf, Sullivan, Collins, Lewis and Bennett, drawing their attention to the fact that he had suffered and continuing to suffer rights violations as a result of Defendants' misconduct in using force against him, then manipulating the disciplinary process to cover it up. Plaintiff's allegations, as further detailed above, also show that these Defendants, all of whom had the authority and wherewithal to direct an investigation into Plaintiff's allegations, declined to do so. Taken all of this together, Plaintiff's allegations amount to an assertion that Defendant City—as shown by its Corrections policymaking officials' nonchalant attitudes toward repeated written pleas of abuse—was deliberately indifferent to rights violations of the sort complained of by Plaintiff.

60. The aforesaid incident is not an isolated incident. The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts, and as reported in the news and by organizations from civil society. See David Anthony Fullard, Supervision and Discipline of COs are Key to Stopping Violence on Rikers Island, Sept. 18, 2014, at http://www.truth-out.org/news/item/26243-effective-supervision-and-rational-discipline-of-corrections-officers-are-key-to-stopping-an-explosion-of-violence-on-rikers-island (last accessed June 13, 2016); Norman Seabrook, What's Really Wrong with Rikers,

Aug. 24, 2014, at http://www.nytimes.com/2014/08/25/opinion/whats-really-wrong-with-rikers.html?_r=0 (last accessed June 13, 2016); Michael Winerip and Michael Schwirtz, <u>Rikers: Where Mental Illness Meets Brutality in Jail</u>, July 14, 2014, at http://www.nytimes.com/2014/07/14/nyregion/rikers-study-finds-prisoners-injured-by-employees.html?_r=0 (last accessed June 13, 2016); Michael Schwirz, <u>Corruption Sweep at Rikers Island Leads to 22 Arrests</u>, June 24, 2014, at http://www.nytimes.com/2014/06/25/nyregion/2-officers-and-20-inmates-are-arrested-in-corruption-sweep-at-rikers-island.html?action=click&contentCollection=N.Y.%20%2F%20Region&module=RelatedCoverage&region=Marginalia&pgtype=article (last accessed June 13, 2016).

61.     In addition, the City is aware of this fact through less formal complaints made such as the ones described in this case, <u>i.e.</u>, an inmate's resort to administrative grievance procedures, Notices of Claim, complaints to the Board of Corrections, or complaints to 311.   On information and belief, the volume of such calls for investigation into rights violations is great.   Mr. Alli's experience represents but one individual's experience at the NYC DOC correctional facilities of the chronic fabrication of evidence and the chronic failure to provide meaningful process.

62.     Defendant City of New York and supervisory officials within its NYC DOC are thus aware that its improper training and customs and policies have often

resulted in a deprivation of individuals' constitutional rights, for example, the use of

unnecessary and/or excessive force to injury inmates and have failed to take sufficient

steps to stop instances of excessive force from continuing.  By way of another

example, Defendant City and its agents are also aware of the failings of the NYC

DOC's failure to provide reliable due process protections to its charges.  In fact, the

due process failures are so frequent and well known, inmates often do not even

expect to receive due process, resulting in a culture that aggravates rights violations by

fomenting individuals' apathy toward even trying to make robust use of that process.

See First Report of the Nunez Independent Monitor, Nunez v. City of N.Y., No. 11

Civ. 5845 (LTS) (JCF), Docket No. 269 (May 31, 2016); see also Winnie Hu and Kate

Pastor, Trial of 5 Rikers Guards Brings Out Culture of Violence at Jail, June 8, 2016

(reporting on allegations that officers assaulted inmate, then fabricated allegations that

the inmate committed physical violence first), at

http://www.nytimes.com/2016/06/09/nyregion/trial-of-5-rikers-guards-brought-out-culture-of-violence-at-jail.html (last accessed June 13, 2016); Michael Schwirtz,

Federal Monitors for Rikers Island Cite Progress and Violence, May 31, 2016, at

http://www.nytimes.com/2016/06/01/nyregion/federal-monitors-for-rikers-island-cite-progress-and-violence.html?action=click&contentCollection=N.Y.%20%2F%20Region&module=RelatedCoverage&region=Marginalia&pgtype=article (last accessed June 12, 2016).

63.     Despite such notice, Defendant City of New York has failed to take corrective action.  This failure caused Individual Defendants in this case to violate Mr. Alli's constitutional rights.

64.     Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that Individual Defendants named herein lacked the objectivity, temperament, maturity, discretion and disposition to be employed as corrections officers.  On information and belief, Defendant City of New York knew this because public records searches show that certain individual corrections officers implicated here have previously been the subjects of good faith inmate complaints. Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train, supervise and discipline them.  For example, public dockets demonstrate that Defendants Pedlar, Behari, Bunton, Almanzar and Bravo have had allegations of undue use of force brought against them in the past.  As another example, another civil rights plaintiff alleged that Defendant Behari failed to intervene when a false assault infraction was filed against the plaintiff after corrections officers used force against him, and that video footage demonstrated the falsity of the infraction.  The action was settled before trial.

65.     All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

66.     All of the aforementioned acts deprived Mr. Alli of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

67.     Institutional failure to address Corrections Officers' violations of inmate rights amounts to constructive endorsement of the same and unwritten departmental policy that rights violations will be tolerated.  Institutional failure is demonstrated by Senior Officials, Policy-Making Officials, Supervisory Defendants, Investigators, the City and others' complicity through a failure to act to correct rights violations in a variety of ways.

68.     Defendant City's handling of videocamera monitoring amounts to a deliberate indifference to inmates' safety, health, well-being and respect for their rights.  Multiple class actions to challenge the routine use of force in unmonitored areas and cover-up tactics including, but not limited to, falsifying infraction, disciplinary and investigative reports and proceedings.  For example, in Nunez v. City of New York, No. 11 Civ. 5845 (LTS) (JCF) (SDNY), and also Ingles v. Toro, No. 01 Civ. 8279 (SDNY), the plaintiffs challenged routine and institutionalized staff violence against detainees in City jails.  Plaintiff contends that systematic video monitoring benefits inmates by holding authorities accountable for their charges and that Defendant City's failure to implement it with greater regularity demonstrates, under

an objective standard, a deliberate indifference to inmates' rights.   Consider, for example, Plaintiff's allegation that Defendant Williams came to video tape him for a moment <u>before</u> the forced cell extraction, then stopped video recording when Defendants conducted the forced cell extraction which was marked by the second alleged assault.  It makes little sense for the equipment to be used only for Defendant City's benefit in such a situation, but not to protect the vulnerable inmate pleading that he feels that he is about to be assaulted.   Relatedly, Plaintiff's allegations in this action, starting in his Original Complaint, have been that to the extent that video recording does occur, as in the case of Defendant Williams but also on the occasion of the January 10, 2012, visiting room assault, it can and should be retained pursuant to a Defendant City policy, practice, custom, rule and/or regulation for a time certain, and not destroyed.  But not only that.  Plaintiff's allegation is that the video recording, to the extent that he made an allegation that Defendants assaulted him, should be made available so that its relevant contents can be examined.  Here, Plaintiff pleaded with Individual Defendants and Policy-Making Defendants, but no one directed that Plaintiff be provided access to the video recording in the context of relating proceedings against him.  According to Plaintiff, this demonstrates that Defendant City has a policy, objectively unreasonable, which amounts to a deliberate indifference to inmates' rights.

69.     The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as corrections and law enforcement officers, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYC DOC, all under the supervision of ranking officers of said department.

70.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

71.     As a result of the foregoing, Mr. Alli is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## 42 U.S.C. § 1983

72.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

73.     Defendants, by their conduct toward Plaintiff alleged herein, violated Plaintiff's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States.

74.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

75.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM
## First Amendment Retailiation

76.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

77.     Defendants violated Plaintiff's First Amendment rights.

78.     Plaintiff engaged in protected speech in response to Defendants' misconduct as described herein including, but not limited to, filing IGRPs, filing grievances with administrative deputies, defending himself robustly at his disciplinary hearings by identifying Defendants' inconsistencies and fabrications, and more. Furthermore, a fundamental allegation in this complaint is that the initial assault was Defendants' attempt to punish Plaintiff for being a party to a civil rights litigation in another context.

79.     Defendants took adverse action against Plaintiff including, but not limited to, falsely reporting him for misbehavior, assaulting him, and depriving him of

running water and an operating toilet. Plaintiff met with a wall of institutional resistance to hearing allegations of CO misconduct.

80.     There was often a causal connection between Plaintiff's protected speech and Defendants' adverse acts. This connection can be reasonably inferred from the facts as described above.

81.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

82.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## THIRD CLAIM
### Excessive Force

83.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

84.     Defendants violated the Fourth and Fourteenth Amendments because they used excessive force against Plaintiff without justification, causing him serious physical harm in the process.

85.     Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

86.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

### FOURTH CLAIM
### Deliberate Indifference To Serious Medical Need

87.     Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

88.     Defendants violated Plaintiff's right under 42 U.S.C. § 1983 to be to be free from deliberate indifference to serious medical need.

89.     As discussed herein, Plaintiff's injuries after the January 10, 2012, assault were such that East Elmhurst Hospital recommended that he obtain MRI testing, therapy, pain medication, and more.  Defendants refused to provide Plaintiff with the same, despite the express instruction from the hospital's doctors and Plaintiff's insistence that Defendants help him.

90.     Also as discussed herein, Plaintiff suffered symptoms such as bloody urine and pain in various parts of his body which significantly impaired his major life activities of sitting, standing, eliminating waste, and more.  Thus, quite apart from the hospital's instructions which Defendants refused to follow, Plaintiff independently

alerted Defendants on a regular basis that he needed medical attention for these serious medical needs, which requests Defendants ignored.

91.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of his constitutional rights.

92.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CLAIM
## Due Process

93.    Plaintiff repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

94.    As described above, certain Individual Defendants arbitrarily imposed discipline upon Plaintiff which had the effect of depriving him of a liberty interest through random and unauthorized acts.

95.    As herein described, by way of example, Defendants provided Plaintiff with no process in the context of his disciplinary hearings.

96.    In imposing discipline upon Plaintiff without due process (none of which Plaintiff seeks to reverse, as he has already endured the consequences), these Defendants caused him to unjustifiably suffer an abrogation of a cognizable constitutional interest.  Plaintiff was a pretrial detainee and as such his liberty interest,

even though admittedly abrogated due to the mere fact of his incarceration, was often greater than that of convicted inmates, not least because pre-trial detainess may not be punished.   Yet Defendants' random and unauthorized misconduct, even as they purported to provide Plaintiff with process, created unreasonably onerous prison conditions for Plaintiff as opposed (1) to other, similarly situated inmates, and (2) to what the law states is the minimum liberty restriction that a pre-trial detainee should have to endure as default conditions.

97.    For example, and as explained above, Plaintiff was subject to special housing restrictions, transportation protocols, visitation limitations and other restrictions as a result of Defendants' misconduct.   In addition, Plaintiff's already unjustifiably restricted existence was regularly subject to additional restriction when he was sent to punitive segregation while awaiting a disciplinary hearing or after an unjustifiable sentence for even more punitive segregation.

98.    With respect to the punitive segregation, although duration is not the only relevant factor to consider in terms of whether a pre-trial detainee has experienced an atypical and severe hardship while in custody, Plaintiff here had the unique—or perhaps common, as the Monell allegations of this lawsuit hold—experience of being regularly and lightly put through the disciplinary process on the basis of fabricated evidence.   In a system in which COs' misconduct becomes more

and more regularized, as Plaintiff's experience was here, it is reasonable to infer that all of these transgressions, when taken together, demonstrate that Plaintiff suffered an experience that was different than the ordinary incidents of prison life, something akin to continuing violation doctrine in other legal contexts.

99.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

100.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CLAIM
## Cruel and Unusual Punishment (Through Due Process Clause)

101.    Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

102.    Pre-trial detainees like Plaintiff should be subjected to no punishment, yet Defendants subjected Plaintiff to cruel and unusual punishment when they assaulted him, causing him serious physical harm.  In addition, Defendants subjected him to cruel and unusual punishment because they unjustifiably yet knowingly and maliciously and/or indifferently subjected him to the equivalent of a deprivation order when they housed him in a cell with inoperable toilet and plumbing.

103.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

104.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## NINTH CLAIM
### Failure to Intervene

105.    Plaintiff repeat and re-allege each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

106.    Individual Defendants actively participated in the aforementioned unlawful conduct but also observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

107.    Accordingly, Individual Defendants who failed to intervene violated the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

108.    Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Plaintiff of their constitutional rights.

109.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## TENTH CLAIM
## MONELL CLAIM

110.   Plaintiff repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

111.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

112.   The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYC DOC included, but were not limited to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Plaintiff's rights as described herein.  As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its corrections officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

113.    The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYC DOC constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiffs.

114.    The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYC DOC were the direct and proximate cause of the constitutional violations suffered by Plaintiff as described herein.

115.    Unfortunately, the aforementioned inappropriate manner in which the City performs administrative justice—fabrication of evidence and arbitrary and random decisionmaking at disciplinary hearings—is common within the NYC DOC facilities at Rikers Island and other locations.  Individuals either perform retaliatory or otherwise inappropriate acts outside the ends of justice, and the NYC DOC's administrative disciplinary procedures are tainted by a general, known, yet long-uncorrected culture that does not attach sufficient value to an individual's right to due process when accused of an infraction.

116.    The aforesaid incident is not an isolated incident.  The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts.  In addition, the City is aware of this fact through

less formal actions taken such as the ones described in this case, i.e., Mr. Alli's complaints to the Board of Corrections, wardens and other officials.  Considering Mr. Alli's diligence in registering his complaints with these entities and people, the aggregate number of calls must be enormous and place the City on notice that corrective action is overdue to address the chronic fabrication of evidence and the chronic absence of meaningful process described in this pleading only by way of one individual's experience.  On information and belief, discovery of other like complaints would reveal impressive results.

117.   Defendant City of New York is thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights.  Despite such notice, Defendant City of New York has failed to take corrective action.  This failure caused Individual Defendants in this case to violate Mr. Alli's constitutional rights.

118.   Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that the Individual Defendants lacked the objectivity, temperament, maturity, discretion and disposition to be employed as corrections officers.   Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train, supervise and discipline them.

119.   All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

120.   All of the aforementioned acts deprived Mr. Alli of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

121.   The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as NYC DOC employees, with the entire actual and/or apparent authority attendant thereto, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYC DOC, all under the supervision of ranking officers of said department.

122.   Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

123.   As a result of the foregoing, Mr. Alli is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiff respectfully request the following relief:

A. An order entering judgment for Plaintiff against Defendants on each of their claims for relief;

B. Awards to Plaintiff for compensatory damages against all Defendants, jointly and severally, for their violation of the First, Fourth, Fifth, Eighth and Fourteenth Amendment rights of Plaintiff, the amount to be determined at jury trial, which Plaintiffs respectfully demand pursuant to FRCP 38;

C. Awards to Plaintiff of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to the constitutional rights and welfare of Plaintiff, the amount to be determined at jury trial, which Plaintiff respectfully demand pursuant to FRCP 38;

D. Awards to Plaintiff of the costs of this action, including reasonable attorneys' fees;

E. Such further relief as this Court deems just and proper.

DATED:     September 28, 2016
           New York, New York

*Ryan Lozar*

Ryan Lozar
305 Broadway, 10th Floor
New York, New York 10007

(310) 867-1562
Fax: 1-877-666-4456
ryanlozar@gmail.com

*Attorney for Plaintiff*